Mark PERRY, Arthur Diemar, Michael McIntosh, and George Miles, Plaintiffs,

v.

Fraydun MANOCHERIAN, New York Health Club, Inc., New York Health & Racquet Club, a partnership, New York Health & Racquet Club Foundation, Inc., Health & Racquet Club Foundation, Inc., Pan Am Equities, Inc., Andrea Rubin, Michelle Pecora, Sean Cronin and Roy Pollack, Defendants.

Nos. 84 Civ. 3610 (RWS), 85 Civ. 4606 (RWS).

United States District Court, S.D. New York.

Nov. 30, 1987.

Hill, Betts & Nash, New York City, for plaintiffs; Thomas A. Holman, A. Jeffrey Weiss, of counsel.

Charles Morrison, New York City, for plaintiffs.

Shea & Gould, New York City, for defendants; Michael S. Feldberg, Rory J. Cutaia, of counsel.

## OPINION

SWEET, District Judge.

### Introduction

Plaintiffs Mark Perry ("Perry"), Arthur Diemar ("Diemar"), Michael McIntosh ("McIntosh"), and George Miles ("Miles") have filed this action against Freydun Manocherian ("Manocherian"), New York Health Club, Inc. ("NYHC"), New York Health & Racquet Club ("NYHRC"), New York Health & Racquet Club Foundation, Inc. ("the Foundation"), Pan Am Equities, Inc. ("Pan Am"), Andrea Rubin ("Rubin"), Michele Pecora ("Pecora"), Sean Cronin ("Cronin"), and Roy Pollack ("Pollack") pursuant to title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. §§ 1981, 1985, N.Y.Exec.Law § 296, and common law claims of intentional infliction of emotional distress.

Plaintiffs contend that due to defendants' discriminatory treatment of blacks in the workplace, Miles and McIntosh had no choice but to leave their jobs, amounting to constructive discharge. Additionally, McIntosh contends that he was denied a promotion because of his race. Further, Perry and Diemar claim retaliation discharge—that they were discharged because they opposed defendants' racially motivat-

ed policies. Defendants have counterclaimed for abuse of process and for intentional infliction of emotional distress. Both sides have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., each side seeking to dismiss the action of the other. For the reasons set forth below, defendants' motion is granted in part and denied in part, and plaintiffs' motion is granted in part and denied in part.

### The Parties

NYHRC, a partnership, is chain of health clubs in the New York City area. Manocherian is its principal and founder, as well as the principal of NYHC, the latter being a partner in NYHRC. Manocherian is also the principal of the Foundation, an allegedly charitable organization established for the purpose of promoting Olympic sports participation, and of Pan Am, a real estate management firm which manages the buildings in which the clubs are located, does business out of the same offices as NYHRC's headquarters, and which shares some employees with NYHRC. At all relevant times, Rubin was the general manager of NYHRC with an office at the West 56th Street branch, Pecora was an assistant club manager and then a club manager at West 56th Street, Cronin was a sales consultant working out of West 56th Street, and Pollack was president of NYHRC.

All four plaintiffs were employed by NYHRC. Mark Perry was a sales consultant from June 1981 until his termination in June 1983. He was stationed at the East 76th Street branch from October 1981 until September of 1982, and at all other times was stationed at the West 56th Street branch. His function was to sell club memberships. Perry is white. Arthur Diemar was employed as the head racquet ball pro for the West 56th Street branch from October 1982 until January 1984. He was responsible for promoting and selling NYHRC racquet ball services and equipment to members, and for conducting clinics, tournaments, and competitions. Diemar is also white. George Miles was employed at the West 56th Street branch from January 1983 until August 1983 as a night

porter. Miles is black. Michael McIntosh was employed at the West 56th Street branch as a porter from March 1983 until June 1983. McIntosh too is black.

**The Issues**

Plaintiffs in this case accuse NYHRC, through its policymakers and those carrying out these policies, of systemwide and deliberate race discrimination leading to the termination of their employment. The "event" that seemingly precipitated the discharge of both Perry and Diemar and the claimed constructive discharge of Miles and McIntosh was an alleged "change" in employee benefits, and plaintiffs' subsequent opposition to this change.

Miles and McIntosh were both employed as night porters at the West 56th Street branch of the NYHRC. As part of their employee benefit package, they were told that they were permitted use of the NYHRC facilities during non-peak hours. However, both men, upon attempting to take advantage of this benefit, were prevented from using the club by defendants Pecora and Rubin. According to plaintiffs, they were denied this benefit because they are black.

Defendants claim that Miles and McIntosh were denied use of the facilities pursuant to a change in benefit policy. They claim that their staff had grown so large in recent years that they had to cut back on the number of employees permitted to use the club. According to defendants, plaintiffs were denied use of the facilities as members of a class of employees—porters —and not because of their race.

However, plaintiffs presented affidavit and deposition testimony directly contradicting defendants' contentions. According to this evidence, the so-called policy change was disparately implemented. Each of the named defendants claim that it took effect at different times, and similarly situated white workers claim not to have been aware of a policy change until over one year after the events in question, if at all.

Additionally, McIntosh claims that he was denied a promotion because of his race. McIntosh allegedly sought a position as a racquet stringer and spoke to Diemar,

the head racquet ball pro, about the position. Diemar allegedly tested McIntosh's ability to run the stringing machine, and, upon finding that McIntosh was proficient, recommended him for the job. McIntosh, however, was turned down for the job without reason, and the job was never filled.

Both Miles and McIntosh left NYHRC of their own accord. However, both claim to have found the working environment so hostile to blacks that they had no choice in their decisions. Thus they claim constructive discharge.

Both Perry and Diemar, on the other hand, were terminated by NYHRC, and both claim that their discharge was for retaliatory purposes. Each claim to have been reprimanded for associating with the black defendants, and to have been ultimately terminated because they took a stand against NYHRC's alleged discrimination against blacks.

Diemar claims to have been reprimanded for allowing McIntosh to use the racquet ball courts, and claims to have been denied the ability to interview and hire a black receptionist. More importantly, Diemar claims that upon learning about NYHRC's treatment of Miles and McIntosh, he helped Miles file a complaint with the City Commission. Soon after Manocherian was served with the complaint bearing Diemar's name as a witness, Diemar was terminated without notice.

Defendants claim that Diemar was terminated because he indulged in substance abuse while on the NYHRC premises, because he stole from the racquet ball pro shop, and because he often arrived late. They presented evidence of these contentions in the form of deposition testimony— mostly of the parties themselves.

Perry contends that he was terminated because he persisted in selling memberships to blacks after having been warned by defendant Pollack not to do so, and because he opposed NYHRC's "policy" of not allowing Miles and McIntosh to use the facilities. Most significantly, he further claims that he was retaliated against for threatening to bring a law suit against

NYHRC in the form of a test case. Non-party deposition testimony indicates that Manocherian was aware of these threats.

Defendant's claim that Perry was terminated because his sales record was unsatisfactory and because he too engaged in substance abuse while on the premises. However, past sales records indicate that Perry was one of NYHRC's top grossing salespeople in 1981 and 1982, and that while his sales fell off somewhat in 1983, there were sales consultants with worse records who were not terminated. Accounts of substance abuse come from the defendants themselves, or from ranking employees of NYHRC.

**Prior Proceedings**

On December 14, 1983, George Miles filed a complaint with the New York City Commission on Human Rights alleging employment discrimination on the basis of race and color. That complaint resulted in the issuance of a letter from the Equal Employment Opportunity Commission on June 4, 1985, granting Miles the right to sue NYHRC.

While awaiting the Commission's decision, Miles, on May 23, 1984, filed an action before this court. A further action, naming all present plaintiffs was filed here on June 13, 1985, and defendants at that point counterclaimed for abuse of process. The two actions were consolidated, resulting in the action presently before this court.

In February 1986, this court denied plaintiffs' motion to dismiss the counterclaims. On April 3, 1987, plaintiffs were permitted to file an amended complaint which formally consolidated the second and third actions. Counterclaims were imposed accordingly.

**Discussion**

This Circuit has determined that the responsibility of a court considering a motion for summary judgment "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Examination of the record to date indicates that factual issues exist with respect to the claims against defendants Manocherian, NYHC, NYHRC, Pan Am, Rubin, Pecora, and Pollack. Indeed, as the issues above indicate, the facts in this case could not be more hotly disputed. However, the summary judgment analysis in a civil rights case is more complex; whether issues of fact must be assessed at each stage of a three part analysis.

**Title VII, Section 1981**

Plaintiffs have alleged, *inter alia*, violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981,[1] and Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. § 2000e *et seq.*[2] The burdens of proof that

1. Section 1981 provides:
   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

2. Section 2000e–2 provides in relevant part:
   (a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
   (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
   Section 2000e–3 provides in relevant part:
   (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any

must be sustained in order to maintain actions for disparate treatment under these sections are identical. First, the plaintiffs must prove a prima facie case of discrimination. If they do, the burden shifts to defendants to rebut that showing by articulating some legitimate reason for the treatment plaintiffs received. If defendants sustain that burden, the plaintiffs must then prove that the reasons articulated by defendants were not the actual reasons but were only a pretext for its discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed. 2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**The Prima Facie Case**

Determining whether a prima facie case has been established here is complicated by the fact that two plaintiffs claim constructive discharge, two claim retaliatory discharge, and one claims discrimination in promotion decisionmaking. The requirements for a prima facie case differ in each situation.

The Second Circuit has articulated a test for determining whether a plaintiff has established a prima facie case of discrimination in a discharge situation. The plaintiffs must show "(1) that [they] belong[ ] to a protected minority; (2) that [they] are qualified for the position; (3) that [they] were discharged; and (4) the discharge occurred in circumstances giving rise to an inference of racial discrimination." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184 (2d Cir.1987) (case under § 1981 but citing Title VII cases as well); *see also Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.) (quoting *McDonnell Douglas Corp., supra,* 411 U.S. at 802, 93 S.Ct. at 1824), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). This standard is applicable to constructive discharge cases as well. *Lopez, supra.*

Both Miles and McIntosh have established a prima facie case of discrimination. Both men are black, and thus are members of a racial minority. That both were qualified for the positions they held is undisputed; defendants have stated that they were satisfied with the work of each man.

Whether Miles and McIntosh have been discharged, thus satisfying the third branch of this test, depends on whether they can make out a case of constructive discharge. This Circuit has held that " '[a] constructive discharge occurs when the employer, rather than acting directly, "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." ' " *Lopez, supra* (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983)) (quoting *Young v. Southwestern Savings and Loan Association,* 509 F.2d 140, 144 (5th Cir.1975)).

■ The record in this case provides sufficient evidence to raise an issue of fact as to whether Miles and McIntosh were constructively discharged. Deposition testimony as well as affidavits allege that both were denied use of the facilities while other similarly situated white employees were permitted such use. Further, the defendants' own failure to agree on a date upon which the new facility-use "policy" was implemented tends to disprove that there was a "policy" at all. Additionally, plaintiffs have presented some evidence that McIntosh was denied a promotion for discriminatory reasons, as will be discussed below. Based on this evidence, a reasonable jury could find that the working environment created by NYHRC and its policymakers was so hostile to blacks as to amount to constructive discharge.

■ Moreover, the evidence giving rise to an inference of constructive discharge also satisfies the fourth prong of the prima facie case. Based on these factors, as well as on other facts in the record—for example, NYHRC's poor record for hiring minority workers for positions requiring high visibility during the period in question—a reasonable jury could determine that the

practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or partici-

pated in any manner in an investigation, proceeding, or hearing under this subchapter.

discharge occurred during circumstances that give rise to an inference of racial discrimination.

■■■ Perry and Diemar have charged NYHRC with retaliatory discharge. To make out a prima facie case of retaliatory discharge, these plaintiffs must show "protected participation or opposition under Title VII known by the alleged retaliator; an employment action disadvantaging the person engaged in the protected activity; and a causal connection between the protected activity and the disadvantageous employment action." *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.1987); *see also Choudhury v. Polytechnic Institute of New York*, 735 F.2d 38, 44 (2d Cir.1984) (retaliation case under § 1981; equates elements of § 1981 case with elements of Title VII case).

Both Perry and Diemar have presented enough evidence to make out a prima facie case of retaliatory discharge. Perry threatened to bring a test case against NYHRC and Manocherian. The deposition testimony of another salesperson indicates that Manocherian was aware of these threats. Diemar helped Miles file a discrimination claim. Manocherian was aware of Diemar's participation. Both of these activities are protected under Title VII.

In satisfaction of the second factor, both men were subjected to employment action that disadvantaged them in that both were discharged from their positions—Diemar without notice.

Finally, the record contains enough evidence for a reasonable jury to infer that participation in the protected activity was the reason for the disadvantageous employment action.

> Proof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct ... or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant.

*DeCintio, supra*, 821 F.2d at 115 (emphasis in original) (citations omitted). Certainly Diemar's dismissal closely followed his participation in the protected activity. There is evidence in the record to show that Manocherian had him fired upon receipt of Miles' complaint. Perry had not actually participated in filing a complaint, however he threatened such action and was discharged soon after making such threats. Moreover, the fact that each of these plaintiffs were disparately treated after participation in or threatened participation in a race discrimination suit provides evidence that helps establish the prima facie case of the other.

■■■ Finally, McIntosh has claimed that NYHRC's decision not to promote him to racquet stringer was discriminatory. To establish a prima facie case of employment discrimination, McIntosh must prove

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Hudson v. International Business Machines Corp.*, 620 F.2d 351, 354 (2d Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

That McIntosh is a member of a racial minority has already been established. The only evidence in the record which tends to make out McIntosh's prima facie case is deposition testimony of plaintiffs Diemar and McIntosh himself. Both have testified that there was an opening for a racquet stringer, that Diemar, as head racquet ball pro, tested McIntosh's ability to run the stringer, that Diemar found him qualified for the job, that Diemar recommended him for the job, and that McIntosh was rejected although the job was not filled by another. However, defendant Cronin did in his deposition testify that when he met McIntosh, the latter was stringing racquets, thus tending to corroborate that McIntosh was both tested and qualified for the position.

Although for the most part the only evidence presented is presented by plaintiffs themselves, this should go to the weight of the evidence rather than to its ability to establish a prima facie case. This is especially so because Diemar's own case of retaliatory discharge hinges on his contact with Miles and not on his contact with McIntosh, the latter taking place in the scope of his employment. Moreover, "[t]he Second Circuit has endorsed a liberal construction of the plaintiff's *prima facie* case requirements, explaining 'the *de mimimis* nature of a plaintiff's burden at the prima facie stage.'" *Logan v. St. Luke's-Roosevelt Hospital Center,* 636 F.Supp. 226, 233 (S.D.N.Y.) (quoting *Meiri, supra,* 759 F.2d at 996 n. 10), *aff'd,* 805 F.2d 390 (2d Cir.1986). Under this standard, plaintiffs' sworn testimony, along with Cronin's corroborating remarks, are sufficient to establish a prima facie case.

Thus, all plaintiffs have established a prima facie case of discrimination under Title VII and § 1981. However, one question must be addressed: Against whom have they established a prima facie case? Section 1981 and the portions of Title VII under which plaintiffs proceed protect individuals from discrimination in employment. Thus, to maintain an action, plaintiffs must establish that defendants fall within the statutory [3] definition of employer. *See Armbruster v. Quinn,* 711 F.2d 1332, 1336 (6th Cir.1983).

All four plaintiffs were employed by NYHRC and thus the prima facie case against it clear. NYHRC is a partnership, and thus its partners are liable for its wrongs. NYHC, as a partner, and Manocherian, as principal of NYHC as well as founder, principal and chief policy maker of NYHRC are also implicated by the prima facie case.

Andrea Rubin and Roy Pollack, as General Manager and President respectively, presumably have a say in the policy mak-

ing of NYHRC. Additionally, they, along with Michele Pecora as club manager of the 56th Street branch, were charged with implementing NYHRC policy, and plaintiffs have specifically alleged that they implemented the offending policies at issue. Thus, these three can fairly be deemed agents of NYHRC, and as agents are liable as employers under the statutory scheme. 42 U.S.C. § 2000e(b); *Jeter v. Boswell,* 554 F.Supp. 946 (D.W.Va.1983).

Plaintiffs have made no such specific allegations against defendant Cronin. Plaintiffs allege that he is a Senior Vice President and thus that he has policy making responsibilities. However, defendants claim that Cronin is a sales consultant, a position comparable to that of plaintiff Perry. NYHRC's employee roster, presented by plaintiffs, substantiated this fact. Since plaintiffs have presented no evidence of acts adverse to them on the part of Cronin, and since there is no evidence tending to show that Cronin acted in a policy making capacity, summary judgment in Cronin's favor will be granted, and the case against him will be dismissed.

Additionally, Manocherian in his affidavit maintains that both the Foundation and Pan Am are unconnected with NYHRC and thus are not proper parties to this action. In order to determine whether these entities are so interrelated as to assume joint responsibility for the acts of the immediate employer, the court will

> assess the degree of (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership.... All four criteria need not be present in all cases and, even when no evidence of common control of labor relations policy is presented, the circumstances may be such that the Title VII single-employer doctrine is applicable.

---

3. The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person....

42 U.S.C. § 2000e(b). The standards for proving employment discrimination under § 1981 are identical, and thus the definition of employer for Title VII purposes is instructive in determining whether a defendant is an employer for § 1981 purposes.

*Armbruster, supra,* 711 F.2d at 1337–38 (collecting cases); *see also Ratcliffe v. Insurance Co. of North America,* 482 F.Supp. 759, 764 (E.D.Pa.1980) ("Where separate corporate entities are so interrelated and integrated in their activities, labor relations, and management, it is clear that for Title VII jurisdictional purposes they may be treated as a single employer.").

The record is replete with facts indicating the interrelatedness of NYHRC and Pan Am. Both firms were headquartered out of the same office on Park Avenue; both firms have common management; employees who were in theory hired to work for one of the entities have in practice been used to do work for the other; and Pan Am rents many of its properties to NYHRC members by advertising in NYHRC publications. Thus, Pan Am is properly a party to this suit.

There is, however, no such evidence with respect to the Foundation. Defendants have presented deposition testimony stating that the Foundation is a non-profit organization established for the purpose of promoting Olympic sports participation. Plaintiffs have presented no evidence to the contrary. Thus, summary judgement will be granted dismissing all claims against the Foundation.

**Defendants' Rebuttal**

■ Once the plaintiffs have made out a prima facie case of discrimination, it is up to the defendants to rebut that case by establishing legitimate, nondiscriminatory motives for the employment actions taken. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. Defendants have fairly met this burden.

Defendants have presented evidence that Miles and McIntosh were denied access to the facilities not based on discriminatory motives but due to a legitimate change in policy. Deposition testimony of white employees who were not allowed to use the club was presented.

■ In their own depositions defendants testified that Perry and Diemar had been seen drinking and using cocaine while on the job, and that their work perform-

ance had deteriorated. Documentation of Perry's sales record for 1983 and a hand written note signed by Diemar apologizing for work related problems support these contentions. While defendants have presented no corroborative evidence regarding either man's drinking or drug use, with the exception of hearsay evidence where the declarant is a defendant, the court will accept defendant's own sworn testimony as sufficient for rebuttal purposes. "The employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine, supra,* 450 U.S. at 257, 101 S.Ct. at 1096.

■ Finally, defendants assert that McIntosh was never denied promotion to racquet stringer because he never applied for the job. They point to the fact that there is no written job application to substantiate his claim, and they offer deposition testimony to that effect. Defendants do not offer evidence of a legitimate reason for their action; they just flatly deny that there was action at all. Once again, the court will accept this as rebuttal evidence and weight it accordingly.

**Pretext**

■ Since defendants have offered evidence to rebut plaintiffs claims of race discrimination, the burden is shifted back to the plaintiffs to establish that defendants' reasons for treating them disparately are not legitimate but are merely pretextual. Plaintiffs can meet their burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095. "In short, [the fact finder] must decide which party's explanation of the employer's motivation it believes." *United States Postal Service Board of Governers v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed. 2d 403 (1983); *see Davis v. State Universi-*

*ty of New York,* 802 F.2d 638, 642 (2d Cir.1986).

Plaintiffs have offered ample evidence to raise a question of fact as to the credibility of defendants' explanations. Specifically, for example, deposition testimony from whites employed in positions comparable to those of Miles and McIntosh indicates that the benefits policy was not uniformly implemented; Perry's sales records indicate above average past performance and adequate 1983 performance when compared with retained sales consultants; Diemar's discharge without notice immediately followed Manocherian's receipt of the state complaint.

Generally, moreover, plaintiffs have presented evidence of widespread discrimination in NYHRC's daily operation thus making defendants' explanations less credible. For example, there is deposition testimony from a black person who was quoted higher prices upon applying for membership; there is testimony that Manocherian expressed displeasure at a sales meeting with whomever sold a membership to an overweight black woman; there is testimony from an applicant for a receptionist's position—a high visibility position—that she was rushed through an interview and told she was inexperienced when she had five years previous training; there is testimony from a Pan Am employee that Manocherian did not want to rent to blacks and thus since Pan Am advertised to NYHRC members did not want memberships sold to blacks. The list continues.

Defendants have objected to the use of much of the evidence plaintiffs rely on for the purposes of overcoming their summary judgment motion on the ground that it is inadmissible hearsay. However, there is ample nonhearsay evidence on the record to raise a triable issue of fact as to pretext. Additionally, many of the so-called hearsay statements appear to be declarations of discrimination made by defendants themselves or by agents of defendants in the scope of their employment, thus at least arguably constituting party admissions. Debate as to this evidentiary point should, in any event, take place at trial, at which time the court will rule definitively.

Thus, plaintiffs have presented enough evidence to raise triable issues of fact as to pretext. It is worth noting that plaintiffs are not "required to submit direct evidence of discriminatory intent" to satisfy this burden. *Aikens, supra,* 460 U.S. at 717, 103 S.Ct. at 1482. That question will ultimately be determined by a jury. They need only raise a doubt as to the validity of the reasons the employer gives for its action. That, the plaintiffs herein, have done.

In sum, the evidence submitted by defendants is sufficient to overcome the Title VII/§ 1981 three part inquiry. Therefore, defendants' motion for summary judgment on these claims is denied as against all defendants except that it is granted as against Cronin and the Foundation.

**Section 1985**

Plaintiffs next contend that defendants conspired to deprive them of the equal protection of the laws under 42 U.S.C. § 1985(3).[4] To prevail on a § 1985(3) claim, plaintiffs must prove a conspiracy; motivated by "racial or perhaps otherwise class-based invidious discriminatory animus"; "for the purpose of depriving either directly, or indirectly, any person or class of persons of equal protection of the laws"; that the conspirator committed some act in furtherance of the conspiracy; and that plaintiffs were either "injured in [their]

---

4. 42 U.S.C. § 1985(3) provides:

(3) If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ...

in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

person or property" or were "deprived of having and exercising any right or privilege of a citizen of the United States." *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971).

■ Defendants have cited numerous cases standing for the proposition that the acts of a single corporation, even if concurred in by several of its directors and agents, does not constitute a conspiracy under § 1985(3). However, this Circuit has held that "this reasoning does not apply at all to a partnership. A corporation is a distinct and fictional legal entity; a partnership is not distinct from its members at all." *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34 (1982), mod. on other grounds, 718 F.2d 22 (2d Cir.1983). Thus, NYHRC, Manocherian and the others are capable of conspiring to deny plaintiffs equal protection of the laws.

■ Moreover, plaintiffs have raised sufficient issues of fact to satisfy the remaining elements of a § 1985(3) action and thus defeat summary judgment. As set out above in the context of Title VII and § 1981, there is evidence on the record from which a jury could infer that defendants' actions were motivated by racial animus; plaintiffs contend, and have presented evidence to the effect that the alleged constructive and retaliatory discharges were racially motivated. Plaintiffs are not required to, as defendants contend *"prove"* racial animus at this stage in the litigation. They need merely raise an issue of fact to defeat a summary judgment motion.

This Circuit, following the Fifth Circuit, has held that "private action constitutes a deprivation of equal protection of the laws under section 1985(3) only when the action violates some federal or state law other than section 1985(3)." *People by Abrams, supra*, 695 F.2d at 42. Plaintiffs have alleged and have presented evidence to the effect that the challenged action amounts to violations of Title VII, § 1981, and New York Human Rights Law § 296. Thus, they have satisfied this branch of the inquiry.

That defendants are alleged to have committed some act in furtherance of the conspiracy and that plaintiffs were injured thereby can hardly be disputed. Defendants denied Miles and McIntosh use of the facilities allegedly because they are black thereby allegedly causing their constructive discharge. Then Perry and Diemar were fired allegedly because they asserted their statutorily protected right to contest discriminatory treatment. Allegations of such treatment together with enough evidence to raise an issue of fact as to the truth of those allegations is sufficient to defeat a motion for summary judgment.

Thus, defendants motion for summary judgment on plaintiffs' § 1985(3) claim is denied with respect to all defendants, except that it is granted with respect to Cronin and the Foundation. As was the case with the Title VII and § 1981 claims, since plaintiffs have presented no evidence sufficiently connecting the Foundation to NYHRC, have presented no evidence that Cronin was an agent of the proper defendants, and have presented no evidence of offending action by either, the claims against them are dismissed.

**State Law Claims**

■ With respect to the Foundation and Cronin, in whose favor summary judgement has been granted, all state law claims are dismissed. This court will not exercise its pendant jurisdiction over parties against whom no federal claims remain. *Nolan v. Meyer*, 520 F.2d 1276, 1280 (2d Cir.), *cert. denied*, 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975); *Logan, supra*, 636 F.Supp. 236.

■ With respect to the remaining defendants, however, summary judgment is denied. The New York Human Rights Law, N.Y.Exec.Law § 296, is a comprehensive civil rights law, comparable in breadth to title VII. It too forbids discrimination in employment, *see Imperial Diner Inc. v. State Human Rights Appeal Board*, 52 N.Y.2d 72, 417 N.E.2d 525, 436 N.Y.S.2d 231 (1980), and includes a codified law against retaliatory discharge, N.Y. Exec.Law § 296(7); *see Bethlehem Steel*

*Corp. v. New York State Division of Human Rights*, 36 A.D.2d 898, 320 N.Y.S.2d 999 (4th Dept. 1971). Thus, since plaintiffs have presented enough evidence to raise an issue of fact as to discrimination under federal law, so too have they raised issues of fact as to discrimination under state law.

■ Additionally, plaintiffs claim damages for intentional infliction of emotional distress. Racial discrimination, and employment decisions based thereon, is an evil a civilized society cannot tolerate. Thus, plaintiffs here too have succeeded in raising an issue of fact as to this state law claim.

■ Since the alleged state discrimination arises out of the same transactions and occurrences as the charges under federal law, this court can and will exercise its discretionary pendant jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### Counterclaims

Defendants claim that plaintiffs filed this and the previous civil rights actions, now consolidated, not for legitimate purposes but to extort large sums of money from the defendants and to cause them adverse publicity in retaliation for being fired. They thus counterclaim for abuse of process and for intentional infliction of emotional distress. Plaintiffs have moved for summary judgement dismissing these claims. For the reasons stated herein, plaintiffs' motion is granted.

### Abuse of Process

The New York Court of Appeals has held that "[a]buse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective...." *Curiano v. Suozzi*, 63 N.Y.2d 113, 116, 469 N.E.2d 1324, 480 N.Y.S.2d 466, 468 (1984) (citations omitted); *see also Tedeschi v. Smith Barney, Harris Upham & Co.*, 548 F.Supp. 1172 (S.D.N.Y.1982) (Weinfeld, J.).

■ The mere issuance of a summons and complaint does not satisfy these elements. "The gist of an action for abuse of process is the improper use of process after it is issued." *Tedeschi, supra*, 548 F.Supp. at 1174. A claimant must show that the process issued interfered with his person or property, such as by attachment or arrest. Defendants have made no such showing, but have merely claimed that the action was brought maliciously to coerce a settlement and to create bad publicity for NYHRC. "A malicious motive alone, however, does not give rise to a cause of action for abuse of process." *Curiano, supra*, 469 N.E.2d at 1326, 480 N.Y.S.2d at 468.

■ Additionally, part of the harm caused must result in actual or special damages. *Tedeschi, supra*, 548 F.Supp. at 1175. Defendants have not alleged such damages. They have presented one letter from a potential member who claims that she and her friend changed their minds regarding joining upon reading an article in New York Magazine detailing the race discrimination claims. While they have presented evidence that membership sales were lower in some branches in 1985 than they were in 1984, they have presented no evidence causally connecting this drop in sales to any activity on the part of plaintiffs. Thus, defendants have failed to sustain their burden on this element.

Moreover, as was discussed above, plaintiffs were able to make out a prima facie case of race discrimination. Indeed, Miles met his burden of showing probable cause to the State Commission such that he was granted permission to bring an action. Thus this court would be hard pressed to find that the suit filed here is without justification.

Therefore, plaintiffs' motion for summary judgement dismissing defendants' first counterclaim for abuse of process is hereby granted.

### Intentional Infliction of Emotional Distress

Under New York law, "[t]he tort of intentional infliction of emotional distress predicates liability on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be

regarded as atrocious and intolerable in a civilized society...." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 480 N.E.2d 349, 355, 490 N.Y.S.2d 735, 741 (1985) (citations omitted). Defendants have raised a question of fact as to whether plaintiffs' actions in this case rise to such an extreme level.

The New York Court of Appeals has held that an action for intentional infliction of emotional distress will not lie when a defendant commences a defamation action solely for the purpose of harassing and intimidating the plaintiff, *Fischer v. Maloney*, 43 N.Y.2d 553, 373 N.E.2d 1215, 402 N.Y.S.2d 991 (1978), nor will one lie when a newspaper publishes an article based on embarrassing entries in a confidential matrimonial court file, *Freihofer, supra*, 490 N.Y.S.2d at 741, 480 N.E.2d at 355; *see also Tedeschi*, 548 F.Supp. at 1176 (former employee's action for intentional infliction of emotional distress against former employer dismissed where former employer filed arbitration proceedings against former employee claiming that employee owed money of his defalcating customer, and where employer made libelous statements about employee in employment verification questionnaire).

▪ The allegations in this case are more compelling than they were in *Freihofer* or *Fischer*. Defendants claim that plaintiffs' suit against them is groundless and that it was instituted only for the purposes of extorting a settlement. While plaintiffs have raised issues of fact sufficient to defeat a summary judgment motion, a jury could find plaintiffs' claim to be without merit. A meritless race discrimination claim combined with threats of publicity made by plaintiffs' attorney creates issues of fact sufficient to defeat a motion for summary judgment.

▪ However, since this court fails to see how an entity can suffer emotional distress, this claim fails in behalf of NYHRC, NYHC, the Foundation, and Pan Am. Thus, plaintiffs' motion for summary judgement on this ground is denied as to the individual defendants but granted as to the institutional defendants.

**Conclusion**

In sum defendants' motion for summary judgment dismissing plaintiffs' Title VII, §§ 1981 and 1985, and state law claims is granted as to all claims with regard to defendants Cronin and the Foundation but is denied as to all other defendants. Plaintiffs' motion for summary judgment is granted insofar as it dismisses defendants' claims for abuse of process and is denied insofar as it pertains to the individual defendants' claim for intentional infliction of emotional distress.

IT IS SO ORDERED.